**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| SOLV WELLNESS, INC. and PHARMATOKA SAS, | CASE NO. |
| Plaintiffs, | |
| v. | |
| DOES 1-10, | **FILED *EX PARTE* AND UNDER SEAL** |
| Defendants. | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR *EX PARTE* (A) TEMPORARY RESTRAINING ORDER; (B) ORDER TO SHOW CAUSE FOR PRELIMINARY INJUNCTION; (C) ASSET FREEZE ORDER; (D) EXPEDITED DISCOVERY ORDER; AND (E) SERVICE BY ELECTRONIC MAIL

Plaintiffs Solv Wellness, Inc. ("Solv Wellness") and Pharmatoka SAS ("Pharmatoka") (collectively, "Plaintiffs") hereby move on an *ex parte* basis for (a) temporary restraining order, (b) order to show cause for preliminary injunction, (c) asset freeze order, (d) expedited discovery order, and (e) order permitting service by electronic mail against Defendants Does 1-10 ("Defendants") based on Defendants' willful counterfeiting and trademark infringement of Plaintiffs' trademarks, and in support thereof submit the following Memorandum of Law.

1

ACTIVE 709903422v5

**INTRODUCTION**

Pharmatoka is engaged in the development, production, manufacture, and worldwide distribution of dietary supplements and herbal medicines for urinary tract health, and since at least 2008, has been using the mark ELLURA® for cranberry supplements to prevent urinary tract infections in women. (Declaration of Winnifred Haesaerts-Texier ("Haesaerts-Texier Decl.") ¶ 5). From April 2015 through April 21, 2025, Solv Wellness was Pharmatoka's exclusive licensee of the ELLURA® mark in the United States and marketed and sold in the United States the ELLURA® supplement. (Haesaerts-Texier Decl. ¶ 6; Declaration of Jana Hubbell ("Hubbell Decl.") ¶ 5). As of April 22, 2025, Pharmatoka's United States subsidiary, Pharmatoka Inc., has a non-exclusive license to market and sell ELLURA® brand supplements in the United States and has begun doing so. (Haesaerts-Texier Decl. ¶ 7). At issue in this lawsuit are two trademarks that are registered with the United States Patent and Trademark Office—ELLURA and SOLV WELLNESS (collectively, "Plaintiffs' Marks").

The quality of ELLURA® by SOLV WELLNESS® brand cranberry supplements is of vital importance to Plaintiffs. (Haesaerts-Texier Decl. ¶ 8; Hubbell Decl. ¶ 6). The ELLURA® supplement is manufactured in accordance with strict quality control standards, enabling Plaintiffs to establish and maintain, over many years, a reputation among women with chronic urinary tract infections for quality,

ACTIVE 709903422v5

consistency, and efficacy. (*Id.*).

Defendants, and perhaps other associated individuals and business organizations, are selling unauthorized and illicit cranberry supplement products that bear counterfeit imitations of the trademarks and trade dress of authentic ELLURA® by SOLV WELLNESS® cranberry supplement products. The counterfeit supplements are being passed off by Defendants as genuine SOLV WELLNESS® branded ELLURA® supplements, although these unauthorized and illicit products have not been manufactured, sold, or otherwise approved by Plaintiffs. Plaintiffs have no control over Defendants' products, which not only are causing Plaintiffs irreparable reputational harm, but also may be posing serious risk to consumers consuming this unknown product.

Based on the evidence submitted below and in the Declarations filed herewith, Plaintiffs apply to this Court *ex parte* for (1) a temporary restraining order and preliminary injunction ordering Defendants to immediately cease and desist from manufacturing, offering for sale, and/or distributing counterfeit goods; (2) an order authorizing expedited discovery in this matter; and (3) an order freezing the unauthorized transfer of Defendants' assets.

Time is of the essence because of the ongoing trademark counterfeiting which harms not only Plaintiffs, but also the consuming public. Without *ex parte* relief, there would be a substantial risk that counterfeit products, documents and other

ACTIVE 709903422v5

evidence of counterfeiting activities would be moved, destroyed, or otherwise made unavailable. It is imperative that all evidence of Defendants' counterfeiting be preserved. Further, without a temporary restraining order and preliminary injunction, Defendants would be permitted to continue infringing Plaintiffs' Marks and deceiving consumers into believing they are purchasing authentic ELLURA® and SOLV WELLNESS® branded cranberry supplements. Plaintiffs only seek such orders as will immediately enjoin Defendants from further infringement and will preserve all possible evidence of Defendants' counterfeiting scheme.

## FACTUAL BACKGROUND

### A. PLAINTIFFS' PRODUCTS AND RELEVANT INTELLECTUAL PROPERTY

Through the marketing and selling of ELLURA® brand supplements, Pharmatoka and Solv Wellness have executed their commitment to developing and offering for sale a high quality and effective product to prevent chronic urinary tract infections in women. Pharmatoka has expended significant time and money into developing ELLURA® supplements using pure, high quality ingredients, adhering to strict quality standards, and ensuring efficacy through rigorous scientific and clinical testing. (Haesaerts-Texier Decl. ¶ 10).  Solv Wellness has similarly invested significant time and money on its own behalf to develop the SOLV WELLNESS® brand and, on Pharmatoka's behalf as Pharmatoka's licensee, to develop the ELLURA® brand as the most potent and effective urinary tract cranberry

4

supplement available. (Hubbell Decl. ¶ 7). Plaintiffs have also undertaken significant efforts to build and maintain their respective images for high-quality and effective products. Such efforts include materials used, scientific and clinical testing, the sales channels, the customer experience, and advertising. (Hubbell Decl. ¶ 7; Haesaerts-Texier Decl. ¶ 10). It is because of Plaintiffs' investment that Solv Wellness is recognized as being associated with the SOLV WELLNESS® mark and Pharmatoka is recognized as being associated with the ELLURA® mark.

Solv Wellness is the owner of all rights, including common law rights, in and to the following trademark and United States Federal Trademark Registration:

| Mark / Reg. No. | Reg. Date / First Use Date | Relevant Goods |
|---|---|---|
| SOLV WELLNESS RN: 6720145 | May 3, 2022 October 2021 | IC 5: medicines for the prevention and treatment of urinary tract infections and improvement of vaginal health and pelvic health; medicinal herbs for urinary disorders and improvement of vaginal health and pelvic health; medicines for urinary disorders in humans and improvement of vaginal health and pelvic health; pharmaceutical preparations based on plant extracts for treatment of urinary disorders in humans and improvement of vaginal health and pelvic health; vaginal moisturizers; probiotic supplements; probiotic preparations for medical use; nutraceuticals for use as a dietary supplement; nutritional supplements |

(Hubbell Decl. ¶ 8). The above trademark registration is valid and subsisting and

5

serves *as prima facie* evidence of the validity of the SOLV WELLNESS® mark and registration, of Solv Wellness' ownership of the SOLV WELLNESS® mark and of its exclusive right to use the mark in commerce on or in connection with all the goods identified in the registration as provided by 15 U.S.C. § 1057(b).

Pharmatoka is the owner of all rights, including common law rights, in and to the following trademark and United States Federal Trademark Registration:

| Mark / Reg. No. | Reg. Date / First Use Date | Relevant Goods |
|---|---|---|
| ELLURA RN: 3745045 | February 2, 2010 April 2008 | IC 5: NUTRITIONAL SUPPLEMENT FEATURING EXTRACT OF PLANT |

(Haesaerts-Texier Decl ¶ 9). The above trademark registration is valid, subsisting, and incontestable under 15 U.S.C. § 1065 and serves as conclusive evidence of the validity of such mark and registration, of Pharmatoka's ownership of the ELLURA® mark, and of its exclusive right to use the mark in commerce on or in connection with all of the goods identified in the registration as provided by 15 U.S.C. § 1115(b). The SOLV WELLNESS® and ELLURA® marks are a symbol of Plaintiffs' quality, reputation, and goodwill and have never been abandoned. (Haesaerts-Texier Decl ¶ 9; Hubbell Decl. ¶ 8).

Defendants do not currently have and have never had the right or authority to use Plaintiffs' Marks for any purpose. (*Id.*). However, despite their known lack of authority to do so, Defendants have been advertising, offering for sale, and/or selling

6

ACTIVE 709903422v5

cranberry supplements to prevent urinary tract infections, bearing counterfeit marks which are identical to the legitimate Plaintiffs' Marks. (*Id.*). Moreover, given Defendants' flagrant copying of Plaintiffs' Marks from Solv Wellness' webpage, genuine goods bearing Plaintiffs' Marks and Defendants' counterfeit goods sold under identical marks are indistinguishable to consumers at the point of sale.

Section 45 of the Lanham Act defines a "counterfeit" as "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. § 1127; *see also Nike, Inc. v. Variety Wholesalers, Inc.*, 247 F.Supp.2d 1352, 1367 (S.D. Ga. 2003) (citing statutory language). Also, using the "ocular test" of direct comparison, courts have found that even marks which are slightly modified from the registered marks copied are to be considered counterfeit marks. S*ee Fimab-Finanziaria Maglificio v. Helio Import/Export, Inc.*, 601 F. Supp. 1 (S.D. Fla. 1983).

In the present action, a comparison of Plaintiffs' Marks at issue to the marks used by Defendants in connection with the sale of Defendants' Counterfeit Goods reveals the obvious counterfeit nature of Defendants' Counterfeit Goods:



Defendants' bottle is high quality like genuine ELLURA® bottle, but is tinted, unlike the genuine ELLURA® bottle.



No lot or expiration date imprinted on Defendants' Goods.

8



Defendants' bottles are sealed, but the seal design is different and lighter in color from genuine ELLURA® bottles.



The counterfeit capsules are size 0 but appear different from genuine ELLURA® capsules because the fill level reaches the top of the capsule and the powder substance inside is darker than the substance inside ELLURA® capsules, and the counterfeit capsules have tiny white particles on them (shown below closer).

9

ACTIVE 709903422v5



(Hubbell Decl. ¶ 11). Defendants are making money by preying on purchasers and members of the general public, at least in this District, most of whom have no knowledge that Defendants are defrauding them through the sale of counterfeit goods. Notably, in addition to being counterfeit, the products sold by Defendants have *none* of the cranberry extract active ingredients found in genuine products. It is unknown what actually *is* in the counterfeit product.

At all relevant times, Defendants have been aware of Plaintiffs' ownership of the Marks and substantial goodwill embodied in Plaintiffs' Marks for quality and effective cranberry supplements. After all, this is the exact reason for Defendants' counterfeiting and infringing conduct.

These Motions are being filed on an *ex parte* basis to prevent the loss of concealment of business records, including electronic records, and depletion of Defendants' Counterfeit Goods which are believed to be in Defendants possession, custody, or control.

## **ARGUMENT**

10

A. **THIS COURT SHOULD ISSUE AN *EX PARTE* TEMPORARY RESTRAINING ORDER.**

### 1. An Ex Parte Temporary Restraining Order is Essential to Prevent Immediate Injury to Plaintiffs and the Consuming Public.

Rule 65(b) of the Federal Rules of Civil Procedure provides, in part, that a temporary restraining order may be granted without written or oral notice to the opposing party or that party's counsel where "it clearly appears from the specific facts shown by affidavit . . . that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or that party's attorney can be heard in opposition."

Defendants herein fraudulently manufacture, promote, advertise, offer for sale, sell, and distribute cranberry supplements bearing Plaintiffs' Marks on Walmart.com under fictitious names, including but not limited to, "TrueWell," "VitaWell Nutrition," "Vitalis Nexus," and "Kangyuan Health" (Hubbell Decl. ¶¶ 10, 12). Defendants create a false association in the minds of consumers between Defendants and Plaintiffs. Specifically, Defendants are wrongfully using counterfeits of Plaintiffs' Marks to increase traffic to their illegal storefronts on the Internet. When an order ships via UPS, there is no traceable information that leads to a legitimate source.

The entry of a temporary restraining order restraining Defendants' use of Plaintiffs' Marks at issue as well as their access and use of Walmart.com and any

11

other later discovered platforms used to promote, advertise, offer for sale, sell, and distribute Defendants' Counterfeit Goods would serve to immediately stop Defendants from benefiting from their wrongful use of Plaintiffs' Marks, protect the public from consuming a potentially dangerous substance, and preserve the status quo until such time as a hearing can be held. *See Dell Inc. v. BelgiumDomains, LLC*, Case No. 07-22674, 2007 WL 6862341, at *2 (S.D. Fla. Nov. 21, 2007) (finding *ex parte* relief more compelling where Defendants scheme was in electronic form and subject to quick, easy, untraceable destruction by Defendants). The facts of this case warrant the issuance of such an order.

Many courts recognize the propensity of certain defendants to dispose of inventory of counterfeit merchandise and records and have not hesitated to grant *ex parte* temporary restraining orders. With each new day, Plaintiffs continue to suffer harm and, more importantly, consumers continue to be at risk of fraud and consumption of an unknown substance at the hands of Defendants. If notice is given of Plaintiffs' intent to seek a temporary restraining order, Defendants can easily "unload" or hide the counterfeit goods or means of making them and destroy their business records to avoid being caught. Plaintiffs' concern in this regard is particularly relevant in this case given the largely electronic nature of Defendants' operation.

Plaintiffs have conducted four test buys of Defendants' Counterfeit Product

12

ACTIVE 709903422v5

through Walmart.com.

| Test Purchase # | Date Ordered /Order # | Walmart Seller | UPS Tracking # | Return Address on Counterfeit Package Received/Address Associated with Walmart Seller |
|---|---|---|---|---|
| 1 | March 31, 2025/Order No. 2000129-23712191 | Kangyuan Health<br><br>J&J Footwear | 940013620756530154239/Label made in Roswell, GA | Kangyuan Health 4570 Buford Hwy Norcross, GA 30071<br><br>J&J Footwear LLC 5629 Saddleback Road, Garland, TX 75043 |
| 2 | April 3, 2025/Order No. 200013046367280 | VitaWellness Nutrition<br><br>Daphne Roberts | 1ZXG38850301566627/Label made in Roswell, GA | HomebyDaphneRoberts 2603 W Muhammad Ali Blvd Louisville, KY 40212 |
| 3 | April 4, 2025/Order No. 2000127-3788116 | Kangyuan Health | 1ZX4232C0312091090/Label made in Roswell, GA | Kangyuan Health_B 231 18th St. NW,_ Atlanta, GA 30363 |
| 4 | April 3, 2025/Order No. 2000131-57731629 | VitaWell Nutrition | 1ZX4921K0300013811/ Label made in Roswell, GA | Vitawell Nutrition 270 17th Street NW Atlanta GA 30363 |

(Hubbell Decl. ¶ 10).

Defendants have taken extensive measures to conceal their identity, a tell-tale

sign that they are fully aware of the repercussions of being caught for counterfeiting.

13

Particularly, Defendants are using fake return and corporate addresses, in at least Kentucky, Georgia, and Texas, when in fact, the product is being shipped from Roswell, Georgia. (*Id.*). Given this explicit effort to avoid detection, it is highly likely that if Defendants were given prior notice of this application for a temporary restraining order, Defendants would destroy or conceal the Counterfeit Goods, as well as any evidence of their distribution and profit from those goods. This Court should prevent such an injustice from occurring by issuing an *ex parte* temporary restraining order restraining Defendants pursuant to Plaintiffs' *Proposed* Temporary Restraining Order. Only such an Order will prevent irreparable harm and maintain the status quo.

### B. ENTRY OF A PRELIMINARY INJUNCTION IS APPROPRIATE AND NECESSARY.

Under the law of this Circuit, in order to obtain a preliminary injunction, Plaintiffs must establish that: (i) they have a likelihood of success on the merits; (ii) there is a likelihood of irreparable harm in absence of temporary or preliminary relief; (iii) temporary or preliminary relief would not cause substantial harm to others; and (iv) temporary or preliminary injunctive relief is in the public interest. *See Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.*, 51 F.3d 982, 985 (11th Cir. 1995) (affirming entry of preliminary injunction and freezing of assets); s*ee also E. Martin & Co. v. Shaw-Ross Int'l Exports*, 756 F.2d 1525, 1530 n. 13 (11th Cir. 1985). As demonstrated below, Plaintiffs' evidence satisfies these elements and

14

ACTIVE 709903422v5

demonstrates that preliminary injunctive relieve is appropriate and necessary.

### 1.  Probability of Success on the Merits of Plaintiffs' Claims

Title 15 U.S.C. § 1114 provides liability for trademark infringement if, without the consent of the registrant, a defendant uses "in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark which is likely to cause confusion, or to cause mistake, or to deceive." To establish their trademark infringement claim under the Lanham Act, Plaintiffs must prove (1) they own the marks at issue; (2) Defendants' use of the marks is without authorization from Plaintiffs; and (3) Defendants' use is likely to cause confusion, mistake, or deception as to the source, affiliation, or sponsorship of Defendants' Counterfeit Goods. *See Babbit Electronics, Inc. v. Dynascan Corp.*, 38 F.3d 1161, 1178 (11th Cir. 1994); *Dieter v. B&H Industries of Southwest Florida*, 880 F.2d 322, 326 (11th Cir. 1989), cert. denied, 498 U.S. 950 (1990).

The first two elements, ownership and lack of authorization, should be undisputed. Plaintiffs Marks, federally registered with the United States Patent and Trademark Office ("USPTO"), are indisputably, respectively, owned by Plaintiffs. (Hubbell Decl. ¶ 8; Haesaerts-Texier Decl. ¶ 9). And Plaintiffs certainly have never authorized Defendants, who are unknown to Plaintiffs and actively conceal themselves, to use the Marks, whether on Defendants' Counterfeit Goods or otherwise. (*Id.*).

15

ACTIVE 709903422v5

The common issue in trademark infringement claims falls on whether the activities of a defendant will result in a likelihood of confusion in the marketplace. *See Ross Bicycles, Inc. v. Cycles USA, Inc.*, 765 F.2d 1502, 1506 (11th Cir. 1985); *HPD, Inc. v. Marine Holdings, Inc.*, 290 F. Supp. 2d 1320, 1327 (M.D. Fla. 2003) (citing *Davidoff & CEI v. PLD Int'l Corp.*, 263 F.3d 1297, 1301 (11th Cir. 2001). Generally speaking, the determination boils down to the existence of likelihood of confusion. *See id.* "Where, as here, one produces counterfeit goods in an attempt to capitalize upon the popularity of, and demand for, another's product, there is a presumption of a likelihood of confusion." *Microsoft Corp. v. Silver Star Micro, Inc.*, 2008 U.S. Dist. LEXIS 1526 (N.D. Ga. Jan. 9, 2008), citing *Polo Fashion, Inc. v. Craftex, Inc.*, 816 F.2d 145, 148 (4th Cir. 1987). Likelihood of confusion is the basic test for both common law trademark infringement and federal statutory infringement. *Investacorp, Inc. v. Arabian Inv. Banking Corp. E.C.*, 931 F2d 1519, 1521 (11th Cir. 1991); *see also Bonito Boats, Inc. v. Thundercraft Boats, Inc.*, 489 U.S. 141, 157 (1989) ("The law of unfair competition has its roots in the common-law tort of deceit; its general concern is with protecting consumers from confusion as to source.").

**2. Plaintiffs and the Public Face a Substantial Threat of Irreparable Harm.**

The clearest threat of harm is to the consuming public. The products being sold by Defendants are not subject to the ISO standards and FDA regulations to

which genuine ELLURA® and SOLV WELLNESS® products are subject. (Hubbell Decl. ¶ 6; Haesaerts-Texier Decl. ¶ 8). Indeed, whatever is in the counterfeit product, it is *not* the cranberry extract that is the active ingredient in genuine ELLURA® supplements. (Hubbell Decl. ¶ 13).

"[A] sufficiently strong showing of likelihood of confusion [caused by trademark infringement] may by itself constitute a showing of … [a] substantial threat of irreparable harm." *Ferrellgas Ptnrs., L.P. v. Barrow*, 143 Fed. Appx. 180 (11th Cir. 2005) (citing *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1310 (11th Cir. 1998) (quoting *E. Remy Martin & Co. v. Shaw-Ross Int'l Imports, Inc.*, 756 F.2d 1525, 1530 (11th Cir. 1985))). Such a finding of irreparable injury following a showing of likelihood of confusion is virtually always made in a case like this, where Plaintiffs have demonstrated that their reputation will erode as a result of Defendants' activities. *Id.* at 90; *see also McDonald's Corp.*, 147 F.3d at 1310 (citing *E. Remy Martin & Co.*, 756 F.2d at 130). Further – while not needed under these circumstances – Plaintiffs are entitled to a rebuttable presumption of irreparable harm. 15 U.S.C. § 1116(a).

Plaintiffs will continue to suffer irreparable injury to their reputation and goodwill for so long as Defendants are allowed to continue their counterfeiting, infringement, and unfair competition activities. (Hubbell Decl. ¶ 14; Haesaerts-Texier Decl. ¶ 11).

ACTIVE 709903422v5

### 3.  The Balance of Hardship Favors Plaintiffs.

Plaintiffs have expended substantial time, money, and resources to develop the product, quality, reputation, and goodwill associated with Plaintiffs' Marks and the genuine goods bearing Plaintiffs' Marks. (Hubbell Decl. ¶¶ 6-7; Haesaerts-Texier Decl. ¶ 10). Plaintiffs have likely already suffered unquantifiable damage to their reputations. Should Defendants be permitted to continue their counterfeiting and infringing conduct, Plaintiffs will continue to suffer substantial loss and damage to their reputation. Further, should Defendants be permitted to continue their operation, the risk of public health repercussions increases.

On the other hand, Defendants will suffer no legitimate hardship if a preliminary injunction is issued. They have no legal or equitable right to engage in their counterfeiting and infringing conduct, and therefore, have no legally or equitably justified hardship to assert. An injunction will serve only to prevent Defendants from engaging in their illegal activities, strongly favoring Plaintiffs' requested relief.

### 4.  The Relief Sought Serves the Public Interest.

A preliminary injunction will serve the public interest by removing illegitimate and unknown medical supplements from commerce. Moreover, Defendants' criminal conduct is fraud against the consuming public by palming off Defendants' Counterfeit Goods as genuine goods of Plaintiffs. The public has a

18

strong interest in not being misled as to the origin, source, or sponsorship of trademarked products. *See Nike, Inc. v. Leslie*, 227 U.S.P.Q. 574, 575 (M.D. Fla. 1985).

### C. AN *EX PARTE* ORDER RESTRAINING TRANSFER OF CERTAIN ASSETS RELATED TO DEFENDANTS' COUNTERFEITING BUSINESS IS WARRANTED.

To further preserve the status quo, Plaintiffs seek an order limiting the transfer of Defendants' unlawfully gained assets. Plaintiffs have demonstrated above that they will likely succeed on the merits of their claims. As such, under 15 U.S.C. § 1117, Plaintiffs will be entitled to an accounting and payment of the profits earned by Defendants through the course of their counterfeiting operations. Due to the deceptive nature of the counterfeiting business, and Defendants' deliberate violations of trademark laws, Plaintiffs respectfully request that the Court grant *ex parte* relief limiting the transfer of the monies in their Walmart.com accounts, as well as any financial accounts which are connected to those accounts.

This Court has broad authority to grant preliminary injunctions to prevent a defendant from transferring assets in cases where equitable interest is claimed. Further, nearly every Circuit has interpreted Rule 65 to grant authority to courts to freeze assets. *See Mason Tenders Dist. Council Pension Fund v. Messera*, 1997 WL 223077 (S.D.N.Y. May 7, 1997) ("[a]lmost all the Circuit Courts have held that Rule 65 is available to freeze assets pendente lite under some set of circumstances").

Courts in the Eleventh Circuit are no exception, consistently noting the

significance of freezing assets in circumstances involving counterfeiting defendants. *See Levi Strauss & Co. v. Sunrise Int'l Trading*, 51 F.3d 982 (11th Cir. 1995); *Reebok Int'l Ltd. V. Marnatech Enter.*, 737 F.Supp 1515 (S.D. Cal. 1989), aff'd 970 F.2d 552 (9th Cir. 1992).

## D. PLAINTIFFS ARE ENTITLED TO EXPEDITED DISCOVERY.

District courts have broad power to permit expedited discovery allowing Plaintiffs to take early depositions and to require early document production in appropriate cases. *See* Fed. R. Civ. P. 30(b), 34(b). Expedited discovery requests are routinely granted in trademark infringement cases. *See, e.g., CampaignZERO, Inc. v. StayWoke Inc.,* 2020 WL 7123066 at *2 (N.D. Ill. 2020) (expedited discovery granted the information at issue was necessary to support the extent of actual confusion and resulting harm to plaintiff); *Apple Inc. v. Samsung Elecs. Co.*, 768 F. Supp. 2d 1040 (N.D. Cal. 2011). To demonstrate that expedited discovery is necessary, courts consider: "(1) whether a preliminary injunction is pending; (2) the breadth of the discovery sought; (3) the purpose of requesting expedited discovery; (4) the burden on the opposing party to comply with the requests; and (5) how far in advance of the typical discovery process the request was made." *Ibarra v. City of Chicago*, 816 F. Supp. 2d 541, 554 (N.D. Ill 2011).

Expedited discovery is necessary here because Defendants have taken steps to mask their real identities. Defendants appear to be using false addresses. As noted

in the supporting declarations, the "return" addresses on the packages shipped by Defendants do not appear to have any connection with the actual Defendants. (Hubbell Decl. ¶ 10). For example, one return address is an auto parts store in Georgia, while another is a residence in Kentucky. (*Id.*) Further, the corporation listed on one of Defendants' Walmart.com storefronts is associated with an address in Texas. (*Id.*) Still further, Defendants appear to be using multiple Walmart.com seller accounts, and multiple UPS accounts. (*Id.* at ¶¶ 10, 12). Yet, Defendants are actually shipping the product from a UPS store in Roswell, Georgia. (*Id.* at ¶ 10).

In order to identify the Doe Defendants, Plaintiffs need to issue subpoenas to Walmart.com (for information associated with the seller accounts, including the addresses on those accounts and the financial information associated with those accounts which will demonstrate where the proceeds of the counterfeit goods are going), UPS (in order to obtain account information associated with these shipments, as well as video of the store where the package was shipped), and likely additional financial institutions (to the extent these are identified in the Walmart.com and UPS account records). Obtaining this information on an expedited basis is essential for not only identifying the Doe Defendants, but also to identify where the counterfeit product is located, in order to get it "off the streets" so that it is no longer shipped to consumers.

**E.   SERVICE ON DEFENDANTS VIA ELECTRONIC MAIL SHOULD BE PERMITTED.**

21

Plaintiffs lastly move the Court to permit service on Defendants via their email addresses associated with the Walmart.com seller storefronts. The backend seller information associated with Defendants' Walmart.com account(s) is the only presently known trail to communicate with Defendants. Upon information and belief, even the UPS account from which the counterfeit product is shipped is linked and labels generated from Defendants' Walmart.com account(s). Therefore, service on Defendants via electronic mail to the email address(es) associated with the Walmart.com storefronts, or any additional email addresses connected to those storefronts that Plaintiffs learn of, should be permitted in this instance.

<b><u>CONCLUSION</u></b>

For the foregoing reasons, this Court should grant Plaintiffs' motion for an *ex parte* temporary restraining order, preliminary injunction, asset freeze order, and expedited discovery.

Dated: April 24, 2025          Respectfully submitted,

By:    */s/ Steven J. Rosenwasser*
       Steven J. Rosenwasser
       Georgia Bar No. 614908
       GREENBERG TRAURIG, LLP
       Terminus 200
       3333 Piedmont Road NE #2500
       Atlanta, GA 30305
       Telephone: (678) 553-2100
       Steven.Rosenwasser@gtlaw.com

22

Cameron M. Nelson
*Pro Hac Vice* Admission to be Sought
GREENBERG TRAURIG, LLP
77 West Wacker Drive, Suite 3100
Chicago, IL 60601
Telephone: (312) 456-8400
NelsonC@gtlaw.com

Alyssa Ortiz Johnston
*Pro Hac Vice* Admission to be Sought
GREENBERG TRAURIG, LLP
2200 Ross Ave., Suite 5200
Dallas, Texas 75201
Telephone: (214) 665-3735
JohnstonA@gtlaw.com

*Attorneys for Plaintiff Solv Wellness, Inc.*

By:    */s/ Elizabeth G. Borland*
Elizabeth G. Borland
Georgia Bar No. 460313
eborland@sgrlaw.com
Anthony L. Cochran
Georgia Bar No. 172425
acochran@sgrlaw.com
SMITH, GAMBRELL & RUSSELL, LLP
1105 W. Peachtree St. NE
Suite 1000
Atlanta, GA 30309
Telephone: (404) 815-3645

*Attorneys for Plaintiff Pharmatoka SAS*

23

## CERTIFICATE OF TYPE LIMITATION

Counsel for Plaintiffs hereby certify that this document was prepared with 14 point Times New Roman font, as permitted by Local Rule 5.1 of this Court's Local Rules.

/s/ Steven J. Rosenwasser
Steven J. Rosenwasser

24

ACTIVE 709903422v5